McCammon v. Baldwin.

McCAMMON, Appellant, v. BALDWIN et al.

Division One, December 17, 1901.

1. **Property Held to Use:** SALE UNDER EXECUTION. Property held to use of a judgment debtor may be sold under execution, and the purchaser thereat may then bring suit against the nominal owner to divest the title out of him and vest it in such purchaser.

2. ———: ———: WRITTEN CONTRACT: NOTES: EXTENSIONS: NEW NOTES. Where defendant agreed to convey the lot in controversy, and other lots, to a corporation to be used in connection with the building of an opera house, and to take in payment therefor and for money loaned said corporation its promissory notes secured by the personal indorsement of the incorporators and others, and nothing more, and such notes are given and accepted, he holds the lot for the use of said corporation, and the same may be sold under execution to satisfy a judgment against the company. And in such case the written contract is the best evidence of the agreement between the parties, and hence it is that the nominal owner of the lot can not enlarge the agreement by showing by parol evidence that he was to hold the title to the lot as security for the payment of the notes, and that other notes given in extension of the original notes remain unpaid. And certainly he can not so hold, even if the lot was to be held by him as security for the old notes, if they have been paid, and the notes he now claims are unpaid are entirely new notes.

McCammon v. Baldwin.

Appeal from Greene Circuit Court.—*Hon. Jas. T. Neville,* Judge.

REVERSED AND JUDGMENT HERE.

*White & McCammon* for appellant.

(1) Baldwin, by his agreement, became a trustee, holding the title to the lot for his associates and for the company afterwards organized. "Promoters occupy a confidential relation to each other, and between a promoter and the company, a fiduciary relation may exist long before the actual formation of a company by registration or otherwise. The promoter assumes the duty of protecting those who ultimately form the company, if he assumes to act for them or induces them to trust him." Alger on Promoters of Corp., sec. 21; 1 Cook Corp., secs. 48, 651; South Joplin Company v. Case, 104 Mo. 580. (2) The relation of trustee and *cestui qui trust* was fixed by the agreement; that relation could not be dissolved nor affected without the consent of all concerned; and there was no claim that any change in that relation had ever been consented to by Baldwin's associates, and the courts will enforce that trust. Flint on Trusts, secs. 268, 274, 275; Ewing v. Shannahan, 113 Mo. 196; Lane v. Ewing, 31 Mo. 82; Leeper v. Taylor, 111 Mo. 324; Hawley v. Marecius, (note) 7 Johns Ch. 174; De Bevoise v. Sandford, Hoff. Ch. 192; Chapin v. Weed Note, Clark Ch. 466. (3) Baldwin and his heirs are estopped from disputing that he held the title as trustee for the company by the following facts: (a) He solemnly admitted he held it as trustee by his agreement. (b) He signed and acknowledged the articles of association first filed, in which it appears he was a stockholder and director, in the Cleveland Building company—the basis of value of his stock being made up in part with the lot in question. (c) He signed and acknowledged the articles of association, filed later

—he being still a stockholder and director in the company. "Where a party has solemnly admitted a fact by deed under his hand and seal, he is estopped from disputing every fact it recites." Stow v. Wyse, 18 Am. Dec. 102; Sass v. Sternberg, 50 Mo. 124; Grumley v. Webb, 44 Mo. 444; Baker v. Railroad, 86 Mo. 75; Murdock v. Milner, 84 Mo. 96; Roberts v. Mosely, 51 Mo. 282; Roberts v. Mosely, 64 Mo. 507; Turner v. Butler, 126 Mo. 137; Bent v. Priest, 86 Mo. 482; Ins. Co. v. Smith, 117 Mo. 294; McAllen v. Woodcock, 60 Mo. 174. (d) Baldwin not only executed a declaration of trust, showing he held the lot in controversy for the building company, he signed and acknowledged the articles of association of said company, in which he was a director and stockholder, and he accepted stock in said company whose value was based in part upon this lot held in trust by him for it; he made promises to convey it to the company; he attached it as property of his associates; he permitted the company to collect the rents without any claim thereto and never attempted to assert an adverse claim until shortly before this action was commenced; he claimed in his deposition, taken in the suit against Porter and his other associates, that he had no claim on the lot by way of security for any money loaned by him, as the court found. (4) Since Baldwin took the title to the lot in controversy as trustee for the company in which he was promoter, stockholder and director, and by all his acts until a short time before the bringing of this action had recognized the estate of the company in it, and its right to demand a conveyance of it, that company had an estate in the lot. R. S. 1899, sec. 4589. The judgment rendered against the building company, December 29, 1894, was a lien against the lot until the issue and levy of the execution in July, 1897, and the estate of the company was vendible and transferable under execution. Under section 4915, Revised Statutes 1889, "all real estate whereof the defendant or any person for his use was seized in law or equity at the time of the rendition of the

judgment, order or decree whereon execution was issued, or at any time thereafter, may be sold under execution." R. S. 1899, sec. 3750; Emberg v. Carter, 98 Mo. 649; Slattery v. Jones, 96 Mo. 219; Holloway v. Holloway, 103 Mo. 283; Melton v. Smith, 65 Mo. 320; Ins. Co. v. Smith, 117 Mo. 290; Morgan v. Bouse, 53 Mo. 220; Goodman v. Simmons, 113 Mo. 130; Jones v. Howard, 142 Mo. 121; Block v. Morrison, 12 Mo. 349. (5) Appellant submits that the court erred in overruling plaintiff's motion to strike out all that portion of Baldwin's testimony contradictory of his written agreement to hold the property in trust. To permit this would violate all law. As the court said in a recent case: "It is an invariable rule of law that, in the absence of fraud or mistake, parol evidence is not admissible to contradict or vary a written contract." Crim v. Crim, 162 Mo. 544; O'Bryan v. Kinney, 74 Mo. 125; Snider v. Express Company, 63 Mo. 376; Railroad v. Cleary, 77 Mo. 637; Mateer v. Railroad, 105 Mo. 352; Kellerman v. Railroad, 105 Mo. 199; Wharton on Contr., sec. 196.

BRACE, P. J.—This is an action brought by the plaintiff against W. W. Baldwin to divest him of the legal title to a lot in Springfield and to have the same vested in the plaintiff. From the judgment of the circuit court in favor of the defendant, dismissing the bill, the plaintiff appealed. After the appeal, W. W. Baldwin died, and the action was revived in the name of the respondents, his heirs and devisees. The facts shown upon the trial fairly appear by the following statement of counsel for appellant:

"In 1891, certain citizens of Springfield, Messrs. Davis, Crawford, Porter and Keyser, desiring to build an opera house in said city, and wishing to ask aid in its construction in the way of subscriptions to be made to them by other citizens, thought a greater amount of assistance could be obtained if the enterprise were in the name of some known capitalist. Since W. W. Baldwin, a promoter of various enterprises, who

lived at Cleveland, Ohio, who had just before this received a
large bonus for the location of stove works at Springfield, was
a capitalist of large means, they thought his name would
greatly assist, and it was arranged with him that his should
be the name under which this enterprise should be conducted,
and the fact that his Springfield associates were interested
with him did not become known for some time afterward.
All subscription notes were to be and were made payable to
him, and the lot in controversy, which was given as a part of
the bonus, was conveyed to him, the deed being held in escrow
to be delivered when the building was completed as stipulated.
Baldwin entered into a written agreement with his associates
and with Seth Tuttle, trustee, to execute and deliver to said
trustee, a conveyance of the lot in controversy and the lots
on which the opera house should be built and to assign to him
all subscriptions, notes and premiums of every kind in aid
of the opera house. The said trustee agreed to accept and
hold the same for the use of said Porter, Crawford, Keyser
and Davis, and to convey and assign the same to them upon
demand as their interest might appear by a contract made by
them. Said Baldwin further agreed to loan his associates
$20,000, to pay the same over to said trustee, to be used in
payment of the lots on which the building should be placed,
$527.80 to be paid to the stove company of which he was
manager, and the remainder in the construction of the build-
ing. To secure him in the sum so loaned, it was agreed said
Porter, Keyser, Crawford and Davis should execute their
notes, all to be indorsed by said Tuttle or some solvent person,
acceptable to Baldwin's agent at Springfield. In accordance
with this agreement, notes were so made, the money so paid,
and the opera house begun and built. In May, 1891, an
effort was made to incorporate, and articles of association of
the Cleveland Building Company were filed, which showed.
the stockholders to be J. D. Porter, one share; W. H. Keyser,
one share; W. W. Baldwin, one share, and W. W. Baldwin,

trustee 997 shares, the three persons named constituting the board of directors. A certificate of incorporation was refused, however, and soon before the completion of the building, another effort was made. The articles this time provided for the incorporation of the Cleveland Building Company, with a capital stock of $125,000, bona fide subscribed and fully paid up, and held by W. W. Baldwin, one share; Marion Davis, one share; Jno. D. Porter, one share; W. H. Keyser, one share; A. B. Crawford, one share, and T. J. Delaney, agent, 1,245 shares; signed and acknowledged by all shareholders, and with a board of directors consisting of said Baldwin, Davis, Porter, Keyser and Crawford, and a certificate of incorporation was issued. The property which formed the basis for the capital stock was made up of the opera house property, the subscription notes and the lot in controversy. All the subscription notes were delivered to the trustee, Tuttle, and were by him collected and the proceeds used in the interest of the company. The possession of the lot in controversy, also, was delivered to him, and the rents collected by him until his trusteeship closed, and the rents for some time thereafter were collected by the officers of the Cleveland Building Company. On the occasion of one of the visits of Mr. Baldwin to Springfield, the making of a deed to the Cleveland Building Company was mentioned to him by Porter, its president, and a deed prepared, but when Porter went to Baldwin's hotel, his wife was out and it could not be executed then. He agreed, however, to execute it on his return from Aurora and on his way to Cleveland. He took another route home, however, and it was not made then. About this time the Cleveland Building Company, being indebted to White & McCammon, a suit was brought against it in a justice's court and summons was served on the president of the company. On the return day the defendant appeared by its president, an attorney, evidence was submitted by both plaintiffs and defendant, and judgment rendered for plaintiffs. A transcript of this judg-

ment was duly filed and after a return of *nulla bona* by the constable, execution was issued by the clerk of the circuit court, the lot in controversy levied upon, advertised and sold by the sheriff and bought by appellant, and sheriff's deed duly executed and recorded by him."

The petition charged that Baldwin held the legal title to the lot in controversy in trust for the Cleveland Building Company; his answer denied this, and alleged that he held the title as his own. No brief in support of the judgment has been filed by respondents. Nor does the ground upon which it was based appear from the record. Baldwin testified on the trial as follows:

"I am the defendant.

"Q. State your version of the history of this difficulty and how you came to be in it, and loan this money, and how the notes were given, and how this property came to be vested in you.

"A. Well, the version of it, to a very great extent, as has been stated is correct, but not full. Mr. Keyser and others came to me one time when I was here in connection with the stove works and presented a project to build an opera house here, stating that the south side needed it and that it could be built if they could get the necessary financial assistance to build it; that really the citizens were willing to put up the greater part of the capital, but in order to get them to put up the capital it was necessary to have capital advanced before the payment of these contributions. They said to me in reference to making them $20,000 loan, that if I would negotiate this loan and procure the money they would pay me $1,000 extra as a bonus, and that they would turn everything over to me as security, and that I should have absolute control of the whole business—should be all put in my hands, so as to make me absolutely safe on this $20,000. They stated that they could make arrangements so that the notes could all be made payable to my order, and this real

estate would be made in my name, and I was to have additional personal security by the indorsement of persons here supposed to be abundantly responsible, and I was to select an agent to judge them. Under those considerations I made them a loan of $20,000, in certain notes, which were received according to agreement and the money was used and the opera house built, and the notes of the citizens became valid, and after the time of notes expired one was paid, leaving $15,000 with certain interest unpaid, and the bonus note which is unpaid to this day. And payment of these notes becoming doubtful I asked Mr. Massey to attach and an action was brought to procure payment on the other $15,000—though not the $1,000. This was in court some time and the other part of the $15,000 was paid. The notes were in court then and finally they were all paid, is my recollection, except some little notes figuring up a little over $2,000. This, it was represented, it would be impossible to pay without crippling the concern, and they wanted an extension, but the papers, etc., were in court and not comeatable for indorsing payments upon—consequently a new note was made—in making which I waived a point to accommodate one of the signers, I think. The new note was taken for the balance remaining upon these old notes, because it couldn't be indorsed upon them, and until this time I considered I had additional security in the form of this lot which I held the deed to. I always considered that lot security for payment of the last extension, together with names upon them. My recollection is that in the negotiations of that renewal of the $2,000 that was fully taken into consideration between me and the other parties—but I wouldn't positively state that—but in my own considerations of the security for the payment of that note I took positively that lot into consideration. Knowing the title to the lot was in me and absolute, I never had a thought that it would be released until that amount of money was paid. Mr. Tuttle had a mining plant at Aurora that I bought for $500, and that was

indorsed on that note as payment, leaving due $1,500 and interest, which I think is in judgment in this court. No judgment has ever been taken for the $1,000. I have always been ready to release the lot as soon as my loan agreed upon was paid. It amounts now to over $2,000 and this added to the bonus note of $1,000 amounts to over $3,000. I have never distressed the parties and have always considered that to a certain extent at least, the judgment was secured by the lot in controversy. I don't think the lot is worth over $1,000."

On cross-examination plaintiff Baldwin stated:

"This note was given about the time of the settlement of the notes in the United States court. It was a balance due me on my loan. I couldn't be certain that it was at the date of settlement then, because I don't remember the date. It was a balance of the original transaction that had never been settled. I wouldn't say positively that it was mentioned that this lot should be security for this note, although it was my understanding, and my recollection would be that it was mentioned as an additional basis for granting the extension for the amount due me, but I wouldn't say that positively. I wouldn't say I made the extension by reason of their agreement that I should hold this lot for security, but from the fact I held the deed to the lot.

"Q. But you never held that deed as security for the loan until this agreement was made? A. I held the deed as security for the loan. I never intended to release the deed until I got my $20,000 and $1,000 bonus. Mr. Sheppard was my agent here, but he and Mr. Massey were to consult, and both were to approve of the security. I had no knowledge of the judgment here—that was left to my attorneys. I knew they were about to form a corporation, but never knew they had really perfected it. I never attended any meeting or took any active part in it. Never knew whether they had perfected a corporation or not."

Hereupon plaintiff made his motion to strike out that

portion of Mr. Baldwin's testimony in which he sets up a different agreement than that in the contract read in evidence, because it is incompetent, and an attempt to contradict a written agreement. Motion overruled and plaintiff duly excepted at the time.

The defense attempted to be set up by this evidence is that title to the lot was to remain in him as security in part for the loan of $20,000 and the bonus of $1,000 that was promised him in the agreement. That there is still due on the original loan the sum of $2,000, for which a new note in extension was given, since reduced to judgment, and the $1,000 bonus—upon payment of which he is willing to release the lot. The written contract between the parties is a complete refutation of this claim. By that contract Baldwin agreed to deliver to said Tuttle, trustee, a good and sufficient deed conveying to him "the lot donated by the citizens of the said city in aid of said enterprise" (the lot in controversy) "and the lot upon which said house shall be erected" (describing it) and "to assign to said Tuttle all subscription notes and premiums of every kind and character in aid of the contemplated opera house. To pay said Tuttle for the use and benefit of said third parties, immediately upon the execution of the bond herein provided for and delivery of same to agent of said Baldwin, at Springfield, Missouri, the sum of $20,527.30, which shall be a loan to said third parties, and secured as hereinafter provided for."

Said second party covenants and agrees to accept said deed, etc., "to accept said subscription lists and notes and the lot subscribed, given and donated in aid of said enterprise, and the same duly assign and convey unto said third parties as their said interest appears," etc. "To receive and accept said $20,527.80 loaned by said first party to said third parties and to expend same as follows: Pay to Porter & Hubbell $1,320, and to W. B. Sandford $3,200, and $527.80 to the Cleveland Stove Company, and the balance expend for labor and ma-

terials in the construction of said building.   To secure the
said first party for the said sum of $20,527.80 so loaned, the
said second party as trustee and the third parties agree to
execute and deliver their four promissory notes each for
$5,131.95, each bearing interest from maturity at eight per
cent per annum and payable three months after date, with
the option to make two renewals thereof of three months each
upon delivery of notes for same amounts upon said terms and
executed and indorsed by same parties as original notes, and
provided further, that each and all of said notes shall be in-
dorsed by Seth Tuttle, or by some other solvent person or
persons, provided, he, Tuttle, or they, be acceptable to the
agent of said Baldwin at Springfield.    Said third parties
further covenant and agree to pay unto said first party out of
the first moneys collected on said subscription notes, the sum
of $1,000."

The covenant on the part of Baldwin to convey the lot is
absolute.   The only security for the loan provided in the con-
tract are the four promissory notes therein mentioned, and
for the bonus is the promise of the parties to pay the same
out of the first moneys collected on the subscription notes.
The written contract is the best evidence of the agreement of
the parties, hence there was no basis for the claim that Bald-
win had the right to retain the legal title to the lot as security
for the demands which he claimed to be due him as part of the
original transaction.   He would not say that it was agreed
that he should hold the lot as security for the new note which
he claimed was an extension of a part of the original loan,
and all the evidence tends to show that there was no such
agreement.   In fact, the evidence tended to prove, and the
court found, that this note was not an extension of the original
loan at all, but a new note, given for a new loan, and there
is not a particle of evidence tending to show any connection
between this lot, and such a loan.   We fail to see in this re-
cord any ground upon which the judgment of the circuit court

can be sustained. Hence, the judgment will be reversed, and judgment will be entered here against the respondents divesting them of the legal title to said lot, and vesting the same in the appellant. All concur.